# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 06-2030

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Elijah I. Jones, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: November 17, 2006
Filed: December 20, 2006

_____

Before BYE, BOWMAN and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Elijah I. Jones entered a plea of guilty to possession with intent to distribute cocaine base and possession of a firearm in furtherance of drug trafficking, conditioned on the right to appeal the district court's[1] denial of his motion to suppress evidence obtained in searches of his residence and vehicle. Jones now appeals the denial of his motion to suppress, and we affirm.

---

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri, adopting the report and recommendation of the Honorable Robert E. Larsen, United States Magistrate Judge for the Western District of Missouri.

# I.    BACKGROUND

On May 2, 2005, Kansas City, Missouri Police Department ("KCPD") Detective Robert Delameter obtained a warrant from a Missouri state judge to search for drugs and firearms at 5236 Euclid Street in Kansas City, Missouri. To obtain the search warrant, Delameter presented under oath a supporting affidavit prepared by an undercover KCPD detective. To establish probable cause for the search, the affidavit cited (1) four anonymous complaints from 2002, submitted via the KCPD's "DRAGNET" citizen complaint system, alleging narcotics sales at the Euclid address and variously naming Jones and two relatives as the sellers; (2) a December 9, 2004 DRAGNET complaint stating that Jones was selling narcotics from the Euclid address, that he carried a weapon, that he had been involved in a shooting the previous day and that he was planning a murder for that day; and (3) trash pulls from the Euclid address on April 8 and April 29, 2005, yielding clear plastic baggies with cocaine and marijuana residue, unused baggies and mail addressed to Jones and two other individuals.

Jones earlier had been identified by the KCPD as associating with the 51st Street Crips, a gang under investigation by the KCPD's Career Criminal Unit ("CCU"). Therefore, the CCU was assigned to execute the search warrant. The CCU consisted of six state officers and eight permanently assigned federal officers under the command and supervision of a state officer. On May 6, 2005, the search warrant was executed by two state and four federal officers of the CCU, again under a state officer's command. A preliminary surveillance drive-by reported several people standing in front of the residence by the open passenger door of a car parked in the street. The officers approached and found Jones and two other individuals standing by the open car door. The officers ordered the individuals to turn and show their hands. Instead, Jones turned and leaned into the car, where his upper body could not be seen, for three to five seconds, then stepped back, closed the car door and followed the officers' orders.

The officers noted that Jones's position and actions were consistent with participation in a drug transaction with an individual in the car. The car's side and rear windows were heavily tinted, preventing any view into the back seat, even with a flashlight. Although the front windshield was clear, the tall split-bench front seat also obscured any view of the back seat. Because the officers believed an armed individual potentially could be concealed in the back seat, the officer in charge decided to conduct a protective sweep of the car. One of the federal officers obtained the keys to the car from Jones. The state officers opened the car door and immediately observed an AK-47 rifle and packages containing crack and marijuana in plain view on the seat. Two additional firearms and ammunition matching the AK-47 were discovered in the search of the residence.

On the following day, state officers obtained a follow-up state-court warrant to search for drugs and weapons in the car. The search uncovered title documents in Jones's name and a photograph of Jones with other individuals in the glove compartment of the car. The documents and photograph were seized.

Jones was charged with possession with intent to distribute cocaine base and possession of a firearm in furtherance of drug trafficking. He moved to suppress all evidence obtained from the searches, arguing that the warrant for the residence was invalid because it was not issued by a federal magistrate judge and was not supported by probable cause; that the protective sweep of the car was not lawful; and that the follow-up search warrant obtained for the car did not authorize the seizure of the documents and photograph. The district court, adopting the magistrate judge's report and recommendation, denied the motion. Jones entered a conditional guilty plea, reserving his right to appeal the denial of the motion to suppress. The district court sentenced him to 21 months on the drug charge and a consecutive 60 months on the firearm charge. Jones now appeals the denial of his motion to suppress.

## II.  DISCUSSION

### A.  Use of a State-Court Search Warrant

Jones first argues that federal officers participated in the search and that Fed. R. Crim. P. 41(b) therefore required any search warrant to be issued by a federal magistrate judge, if reasonably possible, rather than a state court judge.  We review the district court's factual determinations regarding federal involvement for clear error and its legal conclusions de novo.  *See United States v. Spencer*, 439 F.3d 905, 913 (8th Cir. 2006).

"Rule 41 applies only where a warrant is sought by a federal law enforcement officer or where the search can otherwise be characterized as federal in character." *United States v. McCain*, 677 F.2d 657, 662 (8th Cir. 1982).  "Searches may be characterized as federal in character if there is significant federal involvement in the search."  *Id.*  In examining federal involvement, we consider factors such as the existence of an extensive joint state-federal investigation involving the defendant, a joint state-federal application for or execution of the search warrant, and whether federal agents used state officers and more flexible state procedures as a means of avoiding the strictures of Rule 41.  *Id.* at 662-63.

The district court found that the federal officers detailed to the CCU were actually participating in the search as state officers, and we agree.  There is no dispute that the officers, although employed by federal agencies,[2] were permanently detailed to the CCU, a unit of the KCPD.  The district court found that the officers were acting at all times under the command and supervision of the KCPD, not of any federal

---

[2]The federal officers included special agents of the Federal Bureau of Investigation, Drug Enforcement Agency, Bureau of Immigration and Customs Enforcement and Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as deputy marshals of the United States Marshals Service.

agency. We addressed the inverse of this situation in *McCain*, where we noted that state officers "discussed the surveillance of [a defendant] with Anton Wagner, a St. Louis police officer detached to the Drug Enforcement Administration." 677 F.2d at 662. We characterized this discussion with Wagner as "a casual conversation with a *federal officer*." *Id.* at 663 (emphasis added). Just as we recognized a St. Louis police officer detached to the DEA to be participating as a federal officer, we also recognize a federal officer permanently detailed to the KCPD to be participating as a state officer. Because the district court did not clearly err in finding that federal officers participated in the search only in their capacity as permanent members of a KCPD task force, there was no significant federal involvement and, hence, no requirement under Rule 41 to apply to a federal magistrate judge for the search warrant.

Alternatively, even if we were to view the federal officers detailed to the CCU to have participated in the search under the supervision of their respective federal agencies, there still would have been no significant federal participation in the search. Jones contends that the search in the instant case had significant federal involvement based on *United States v. Tavares*, 223 F.3d 911 (8th Cir. 2000). In *Tavares*, we found significant federal participation triggered the federal no-knock warrant requirements of 18 U.S.C. § 3109 where federal officers discussed the possibility of a federal prosecution with state police prior to participating in a search authorized by a state-court-issued warrant. *Id.* at 915. This was so even though the federal officers were not involved in the planning, directing or organization of the search. *Id.* We held that "[w]here federal agents directly participate in a search conducted pursuant to a state warrant, but with an expectation of federal prosecution, the stage is set for the circumvention of more restrictive federal requirements such as those set forth in section 3109." *Id.* at 916.

*Tavares* would not control in the instant case for two reasons. First, the district court made a factual finding that the federal agents had no expectation of federal

prosecution prior to the search.[3]  Second, Jones has not asserted any potential evasion of a substantive federal requirement, such as the evasion of the § 3109 no-knock warrant requirements in *Tavares*.  Instead, the instant case would appear to be controlled by *United States v. Schroeder*, 129 F.3d 439 (8th Cir. 1997), where we found no significant federal involvement "[e]ven if there were federal officers present at the search . . . [because] the warrant was not issued and executed pursuant to federal authority."  *Id.* at 443.  *Tavares* did not overrule *Schroeder*, but rather distinguished it on the basis that the federal officers in *Tavares* envisioned a federal prosecution, yet avoided the federal no-knock warrant requirements of § 3109.  *Tavares*, 223 F.3d at 916.  In the instant case, as in *Schroeder*, "[the federal rule] was irrelevant to [the officers] at the time the warrant issued." *Schroeder*, 129 F.3d at 443 (quoting *United States v. Moore*, 956 F.2d 843, 847 (8th Cir. 1992)) (alterations in *Schroeder*). Therefore, even if we were to view the federal officers detailed to the CCU to have participated in the search under the supervision of their respective federal agencies, there would have been no significant federal participation in the search and Rule 41 would not apply.

## B.     Errors and Omissions in the Supporting Affidavit

Jones argues that the affidavit in support of the search warrant for the residence was invalid because it omitted relevant facts such as a fruitless search of the Euclid residence in 2002 and contained factual errors regarding the content of the 2002

---

[3]Prior to executing the warrant, the CCU notified an Assistant United States Attorney who was conducting a federal prosecution of other members of the 51st Street Crips to keep him abreast of any information-proffer opportunities that might arise to advance the Crips investigation.  The district court found that this contact did not involve deciding whether Jones would be prosecuted by state or by federal authorities.  Jones cites no evidence to suggest that this finding is clearly erroneous.

DRAGNET reports and Jones's prior criminal activity.[4]  To invalidate a search warrant obtained through the omission of relevant information, the defendant must show, inter alia, "that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *United States v. Allen*, 297 F.3d 790, 795 (8th Cir. 2002).  Similarly, to invalidate a search warrant obtained through the inclusion of false information in the affidavit, the defendant must show, inter alia, that "the allegedly false statement is necessary to the finding of probable cause." *United States v. Timley*, 443 F.3d 615, 623 (8th Cir. 2006), *cert. denied*, --- U.S. --- , 127 S. Ct. 299 (2006) (quoting *Franks v. Delaware*, 438 U.S. 154, 156 (1978)).  Probable cause is established "if, 'given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found' in the place to be searched." *United States v. Mahler*, 141 F.3d 811, 813 (8th Cir. 1998) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Assuming all Jones's allegations of errors and omissions to be true, the affidavit still supported a finding of a fair probability that contraband or evidence of a crime would be found at 5236 Euclid.  In particular, the anonymous DRAGNET tip from December 2004 combined with the drug residue found in two successive trash pulls on April 8 and April 29, 2005, were sufficient to establish probable cause that illegal drugs would be found in the residence on May 6, 2005.  *See Timley*, 443 F.3d at 624 (holding that "two trash pulls, conducted within a week of one another, . . . which yielded small and large bags containing marijuana and residue" were sufficient to establish probable cause to search a residence); *see also United States v. Briscoe*, 317 F.3d 906, 907-08 (8th Cir. 2003) (finding probable cause based solely on a trash pull that yielded 40 marijuana seeds and 25 stems).  Jones does not allege any errors or

_____

[4]In support of a request to make the warrant a no-knock warrant, the affidavit stated that Jones was "on probation for second degree assault and unlawful use of a weapon" after being "charged with aggravated assault, and discharge of a firearm." Jones contends that he was actually charged with second degree domestic assault and exhibiting, rather than discharging, a firearm.

-7-

omissions that would bear on the reliability of the December 2004 DRAGNET tip or the results of the two trash pulls. Therefore, Jones's argument that omissions and errors in the supporting affidavit invalidated the search warrant must fail.

Jones also challenges the affidavit on the grounds that the affiant, KCPD Detective Delameter, had no personal knowledge of, and did not attempt to verify, the facts contained in the affidavit. An undercover detective collected the information, prepared the affidavit and passed it to Detective Delameter for presentation to a judge. Detective Delameter testified at the suppression hearing that this is a common practice to protect the identity of undercover detectives. Jones argues that Detective Delameter's oath as the affiant was not based upon "personal knowledge" and that the warrant was therefore defective. *See* U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . .").

We find nothing in these circumstances to suggest a faulty oath or defective warrant. We have held that, where a detective other than the affiant is the source of the information in the affidavit, the other detective is the functional equivalent of a reliable informant. *United States v. Hyten*, 5 F.3d 1154, 1156 (8th Cir. 1993). In the instant case, the affidavit made no representation that Detective Delameter had personally verified the contents of the DRAGNET complaints or conducted the trash pulls. Instead, it stated that an unnamed "Detective with the Kansas City Missouri Police Department, Street Narcotics Unit" had done so. Detective Delameter had personal knowledge of the undercover detective's reliability, and the references to the undercover detective in the affidavit made clear the detective's "position in the community and, inferentially, his reputation for veracity" to the issuing judge. *Id.* Jones's "argument that the Fourth Amendment was violated because there was no oath by the affiant totally ignores [Detective Delameter's] oath and adoption of the affidavit." *Id.* Accordingly, we affirm the validity of the search warrant for the Euclid residence.

## C.    The Protective Sweep of the Vehicle

Jones contends that the protective sweep of the vehicle during execution of the search warrant at the Euclid residence was unlawful.  We review the district court's determination of the lawfulness of a protective sweep de novo and its underlying factual findings for clear error.  *United States v. Thomas*, 249 F.3d 725, 729 (8th Cir. 2001).

In the context of a search incident to an arrest, a protective sweep is lawful where there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 334 (1990).  We have recognized that these same concerns may justify a protective sweep of a vehicle even in the absence of an arrest:

> [T]he officers had reasonable suspicion to believe that Thomas [who was driving a van] had just committed an armed bank robbery.  In order to protect their safety while they stopped Thomas, the officers needed to ensure that others would not be emerging from the van.  Unlike the typical vehicle, the officers could not see inside the van from the outside, making it necessary to enter the van to determine if it contained additional occupants. . . .
>
> We agree with the district court that the search of the van was reasonably necessary for the officers' personal safety in conducting the stop because other occupants in the van could pose a significant danger to the officers.  Thus, having lawfully been in the van searching for occupants, the items that were in plain view of the officers could be seized as evidence without a warrant.

*Thomas*, 249 F.3d at 729-30.

As in *Thomas*, a protective sweep was justified in the instant case. The officers in *Thomas* were lawfully in the presence of the van based upon reasonable suspicion to stop the driver; in the instant case, the officers were lawfully on the scene pursuant to a valid search warrant. Although the vehicle was not on the premises covered by the search warrant, it was parked on the public street immediately adjacent, so that an armed individual inside could pose a danger to officers on the scene. *Cf. Buie*, 494 U.S. at 334. In *Thomas*, a prudent officer could reasonably anticipate a dangerous individual in the van based upon reasonable suspicion that the driver had just committed an armed bank robbery; in the instant case, the officers executing the warrant were aware that it was based on probable cause to believe that drugs were being sold at the residence, an enterprise that often involves drive-up transactions and the presence of firearms. Moreover, the officers were aware that Jones was a resident of the premises being searched, had been described in an anonymous tip as involved in a shooting five months previously and had a previous conviction for unlawful use of a firearm. When the officers arrived, Jones leaned into the car, out of sight, for three to five seconds before shutting the door and complying with the officers' commands. Based on the officers' knowledge of the facts supporting the search warrant and Jones's actions when the officers approached, reasonably prudent officers could believe that Jones was conducting a drug transaction with an individual in the vehicle and that the individual could pose a danger to the officers. As in *Thomas*, "[i]n order to protect their safety . . ., the officers needed to ensure that others would not be emerging from the [vehicle]" and "the officers could not see inside the [vehicle] from the outside, making it necessary to enter the [vehicle] to determine if it contained additional occupants." 249 F.3d at 729-30. Therefore, the protective sweep of the car was "reasonably necessary for the officers' personal safety." *Id.* at 730. Because the officers entered the vehicle lawfully, they were authorized to seize the AK-47 rifle and packages containing crack and marijuana that were in plain view on the seat. *Id.* Therefore, the district court did not err in denying the motion to suppress the evidence obtained from the protective sweep of the vehicle.

**D.    Documents and Photograph**

Jones argues that the title documents and photograph seized from the glove compartment of the vehicle were outside the scope of the follow-up search warrant obtained for the vehicle.  Unlike the original search warrant for the residence, which included "indicia of ownership" among the items to be seized, the follow-up search warrant for the vehicle only authorized the seizure of narcotics and weapons, not associated items.  The Government argues that the seizure was lawful because the items were discovered in plain view while searching an area that could have contained narcotics or weapons.  However, the plain view doctrine would only apply if the incriminating nature of the items was readily apparent.  *See, e.g.*, *United States v. Nichols*, 344 F.3d 793, 799 (8th Cir. 2003) ("Under the plain view doctrine, . . . officers may seize an item if they have a lawful right of access to the item seized and the object's incriminating nature is immediately apparent.").

We need not determine whether the title documents and photograph had a "readily apparent" incriminating nature in this case.  We find that any error in failing to suppress the documents and photograph was harmless because those items did not form the basis for any criminal charges against Jones.  *See Timley*, 443 F.3d at 623 (holding that, while a warrant's authority to search may have been overbroad, any failure to suppress the seized evidence was harmless because the warrant was sufficient "as to items seized that formed the basis for the criminal charges").  Presumably, the Government at most could have used the documents and photograph to prove Jones's ownership of the vehicle and, by extension, his dominion and control over the contraband previously discovered in the vehicle.  However, Jones admitted his ownership of the vehicle immediately after the execution of the search warrant for the Euclid residence, before the follow-up search warrant for the vehicle was obtained.  *See* Supp. Tr. at 93-94.  Although Jones disclaimed ownership of the contraband within the vehicle, he did not dispute his ownership of the vehicle at any point in the proceedings.  *Id.* at 105.  Because the documents and photograph allegedly seized

outside the scope of the search warrant were not material to any criminal charge against Jones, any error in failing to suppress those items was harmless.

## III.   CONCLUSION

We hold that the state-issued search warrant for the Euclid residence was valid and was supported by probable cause, that the protective sweep of the vehicle was lawful and that any error in failing to suppress the documents and photograph seized pursuant to the follow-up search warrant for the vehicle was harmless.  Accordingly, we affirm the district court's denial of the motion to suppress.

_____